OPINION OF THE COURT
Smith, J.
The issue here is whether a police officer who has probable cause to believe a driver has committed a traffic infraction violates article I, § 12 of the New York State Constitution when the officer, whose primary motivation is to conduct another investigation, stops the vehicle. We conclude that there is no violation, and we adopt Whren v United States (517 US 806) as a matter of state law.
I

People v Robinson

On November 22, 1993, New York City police officers in the Street Crime Unit, Mobile Taxi Homicide Task Force were on night patrol in a marked police car in the Bronx. Their main assignment was to follow taxicabs to make sure that no robberies occurred. After observing a car speed through a red light, the police activated their high intensity lights and pulled over what they suspected was a livery cab. After stopping the cab, one officer observed a passenger, the defendant, look back several times. The officers testified that they had no intention of giving the driver a summons but wanted to talk to him about *347 safety tips. The officers approached the vehicle with their flashlights turned on and their guns bolstered. One of the officers shined his flashlight into the back of the vehicle, where defendant was seated, and noticed that defendant was wearing a bulletproof vest. After the officer ordered defendant out of the taxicab, he observed a gun on the floor where defendant had been seated. Defendant was arrested and charged with criminal possession of a weapon and unlawfully wearing a bulletproof vest. Defendant moved to suppress the vest and gun, arguing that the officers used a traffic infraction as a pretext to search the occupant of the taxicab. The court denied the motion, and defendant was convicted of both charges. He was sentenced as a persistent violent felony offender to eight years to life on the weapons charge and IV2 to 3 years on the other charge.
In affirming, the Appellate Division applied the Whren rationale (271 AD2d 17 [2000]). We affirm the unanimous order of the Appellate Division.

People v Reynolds

On March 6, 1999, shortly after midnight, a police officer, on routine motor patrol in the City of Rochester, saw a man he knew to be a prostitute enter defendant’s truck. The officer followed the truck and ran a computer check on the license plate. Upon learning that the vehicle’s registration had expired two months earlier, the officer stopped the vehicle.
The resulting investigation did not lead to any charges involving prostitution. Nevertheless, because the driver’s eyes were bloodshot, his speech slurred and there was a strong odor of alcohol, police performed various field sobriety tests, with defendant failing most. Defendant was placed under arrest for driving while intoxicated. At the police station, tests indicated that defendant’s blood alcohol level was .20% double the legal limit of .10% (see, Vehicle and Traffic Law § 1192 [2]).
Defendant was charged with driving while intoxicated, an unclassified misdemeanor, and operating an unregistered motor vehicle, a traffic infraction. Defendant’s motion to suppress was granted by the Rochester City Court which dismissed all charges. County Court affirmed the dismissal, holding that the traffic violation was merely a pretext and the officer’s primary motivation was to investigate prostitution. We reverse.

People v Glenn

On November 7, 1997, plainclothes police officers were on street crime patrol in an unmarked car in Manhattan. They *348 observed a livery cab make a right hand turn without signaling. An officer noticed someone sitting in the back seat lean forward. The police stopped the vehicle to investigate whether or not a robbery was in progress. A police officer subsequently found cocaine on the rear seat and, after he arrested defendant, found additional drugs on his person. Defendant was charged with criminal possession of a controlled substance in the third degree and criminally using drug paraphernalia in the second degree. He contended that the drugs should be suppressed, asserting that the traffic infraction was a pretext to investigate a robbery. After his motion to suppress was denied, he pleaded guilty to one count of criminal possession of a controlled substance and was sentenced, as a second felony offender, to 44/2 to 9 years in prison. Relying on Whren, the Appellate Division unanimously affirmed the conviction (279 AD2d 422 [2001]). We affirm the order of the Appellate Division.
II
The Supreme Court, in Whren v United States (517 US 806 [1996]), unanimously held that where a police officer has probable cause to detain a person temporarily for a traffic violation, that seizure does not violate the Fourth Amendment to the United States Constitution even though the underlying reason for the stop might have been to investigate some other matter.
In Whren, officers patrolling a known drug area of the District of Columbia became suspicious when several young persons seated in a truck with temporary license plates remained at a stop sign for an unusual period of time, and the driver was looking down into the lap of the passenger seated on his right. After the car made a right turn without signaling, the police stopped it, assertedly to warn the driver of traffic violations, and saw two plastic bags of what appeared to be crack cocaine in Whren’s hands.
After arresting the occupants, the police found several quantities of drugs in the car. The petitioners were charged with violating federal drug laws. The petitioners moved to suppress the drugs, arguing that the stop was not based upon probable cause or even reasonable suspicion that they were engaged in illegal drug activity and that the police officer’s assertion that he approached the car in order to give a warning was pretextual. The District Court denied suppression, and the Court of Appeals for the District of Columbia Circuit affirmed (53 F3d 371 [1995]).
The Supreme Court held that the Fourth Amendment had not been violated because “[a]s a general matter, the decision *349 to stop an automobile is reasonable where the police have probable cause to believe that a traffic violation has occurred” (Whren, supra, 517 US, at 810). The stop of the truck was based upon probable cause that the petitioners had violated provisions of the District of Columbia traffic code. The Court rejected any effort to tie the legality of the officers' conduct to their primary motivation or purpose in making the stop, deeming irrelevant whether a reasonable traffic police officer would have made the stop. According to the Court, “Subjective intentions play no role in ordinary, probable-cause Fourth Amendment analysis” (id., at 813). Thus, the “Fourth Amendment’s concern with ‘reasonableness’ allows certain actions to be taken in certain circumstances, whatever the subjective intent” (id., at 814).
More than 40 states and the District of Columbia have adopted the objective standard approved by Whren or cited it with approval (see, Appendix).[1]
Ill
In each of the cases before us, defendant argues that the stop was pretextual and in violation of New York State Constitution, article I, § 12. By arguing that the stops were pretextual, defendants claim that although probable cause existed warranting a stop of the vehicle for a valid traffic infraction, the officer’s primary motivation was to conduct some other investigation.
We hold that where a police officer has probable cause to believe that the driver of an automobile has committed a traffic violation, a stop does not violate article I, § 12 of the New York State Constitution. In making that determination of jprobable cause, neither the primary motivation of the officer nor a determination of what a reasonable traffic officer would have done under the circumstances is relevant.
*350 We have observed that because the search and seizure language of the Fourth Amendment and of article I, § 12 is identical, they generally confer similar rights (see, People v Harris, 77 NY2d 434, 437 [1991]; People v P. J. Video, 68 NY2d 296, 304 [1986] ).[2] Nevertheless, this Court has not hesitated to expand the rights of New York citizens beyond those required by the Federal Constitution when a longstanding New York interest was involved (see, e.g., People v Scott, 79 NY2d 474 [1992]; People v Keta, 79 NY2d 474 [1992]; People v Griminger, 71 NY2d 635 [1988]; People v P. J. Video, supra; People v Bigelow, 66 NY2d 417 [1985]).
This Court has always evaluated the validity of a traffic stop based on probable cause that a driver has committed a traffic violation, without regard to the primary motivation of the police officer or an assessment that a reasonable traffic officer would have made the same stop. Where the police have stopped a vehicle for a valid reason, we have upheld police conduct without regard to the reason for the stop (People v David L., 81 AD2d 893, revd on dissent below 56 NY2d 698 [1982], cert denied 459 US 866).
This Court has never held that a pretextual stop, as opposed to subsequent police conduct, was violative of article I, § 12. The dissent does not disagree (dissenting opn at 367-368). Although the Appellate Divisions have, on occasion, examined the primary motivation of a police officer in evaluating a traffic stop, all seven of the Judges on this Court acknowledge the “difficulty, if not futility, of basing the constitutional validity of searches or seizures on judicial determinations of the subjective motivation of police officers” (dissenting opn at 371). Thus, we are unanimous in our view that the primary motivation test is not, and should not be, part of our State constitutional jurisprudence.
*351 Defendants, however, point to several of our cases — most notably People v Spencer (84 NY2d 749 [1995]) — and contend that we have previously indicated our disapproval of pretextual police conduct. Defendants5 reliance on People v Spencer is misplaced. There, we held that the stop of the vehicle merely to request information from the driver concerning the whereabouts of a criminal suspect was an unreasonable seizure in violation of the Fourth Amendment. In that case, the defendant had not committed a traffic violation.
We noted that “police stops of automobiles in this State are legal only pursuant to routine, nonpretextual traffic checks to enforce traffic regulations or when there exists at least a reasonable suspicion that the driver or occupants of the vehicle have committed, are committing, or are about to commit a crime” (id., at 753). However, we explained what we meant by pretextual when we further noted that “there were no objective safeguards circumscribing the exercise of police discretion” and that if such stops “were permissible and motorists could in fact be pulled over at an individual police officer's discretion based upon the mere right to request information, a pandora’s box of pretextual police stops would be opened” (id., at 758, 759). Central to Spencer9s holding was the absence of an objective standard for stopping a vehicle. Thus, a police officer could contrive a reason to stop a vehicle merely to make an inquiry. However, an objective standard is present here — the Vehicle and Traffic Law.
Moreover, in none of the cases in which we have extended the rights of New York State defendants beyond those of the Federal Constitution have we questioned a police officer’s authority to act when there was probable cause to conclude that a law or regulation has been violated. None of the reasons for extending protections of our Constitution beyond those given by the Federal Constitution exist here. In this case, regulating the ability of the police to stop a vehicle when there is probable cause to believe that a traffic regulation has been violated does little to expand the rights of the accused. Instead it may lead to the harm of innocent citizens. Thus, for example, in People v Reynolds, the stop of the automobile led to the arrest of a person driving under the influence of alcohol.
The real concern of those opposing pretextual stops is that police officers will use their authority to stop persons on a selective and arbitrary basis. Whren recognized that the answer to such action is the Equal Protection Clause of the Constitution. We are not unmindful of studies, some of which *352 are cited by defendants and the amici,[3] which show that certain racial and ethnic groups are disproportionately stopped by police officers, and that those stops do not end in the discovery of a higher proportion of contraband than in the cars of other groups. The fact that such disparities exist is cause for both vigilance and concern about the protections given by the New York State Constitution. Discriminatory law enforcement has no place in our law.
Indeed, in Brown v State of New York (89 NY2d 172 [1996]), this Court recognized that in New York State, a plaintiff has a cause of action for a violation of the Equal Protection Clause[4] and the Search and Seizure Clause of the State Constitution. In upholding the right of African Americans to sue for alleged violations of their right to equal protection and freedom from unreasonable searches and seizures, when they were detained because of their race during a police investigation, this Court stated:
“These sections [art I, §§ 11, 12] establish a duty sufficient to support causes of action to secure the liberty interests guaranteed to individuals by the State Constitution independent of any common-law tort rule. Claimants alleged that the defendant’s officers and employees deprived them of the right to be free from unlawful police conduct violating the Search and Seizure Clause and that they were treated discriminatorily in violation of the State Equal Protection Clause. The harm they assert was visited on them was well within the contemplation of the framers when these provisions were enacted for fewer matters have caused greater concern throughout history than intrusions on personal lib *353 erty arising from the abuse of police power. Manifestly, these sections were designed to prevent such abuses and protect those in claimants’ position. A damage remedy in favor of those harmed by police abuses is appropriate and in furtherance of the purpose underlying the sections” (89 NY2d, at 191).
The alternatives to upholding a stop based solely upon reasonable cause to believe a traffic infraction has been committed put unacceptable restraints on law enforcement. This is so whether those restrictions are based upon the primary motivation of an officer or upon what a reasonable traffic police officer would have done under the circumstances. Rather than restrain the police in these instances, the police should be permitted to do what they are sworn to do — uphold the law.
In none of the cases cited by defendants has this Court penalized the police for enforcing the law. We should not do so here. To be sure, the story does not end when the police stop a vehicle for a traffic infraction. Our holding in this case addresses only the initial police action upon which the vehicular stop was predicated. The scope, duration and intensity of the seizure, as well as any search made by the police subsequent to that stop, remain subject to the strictures of article I, § 12, and judicial review (People v Troiano, 35 NY2d 476 [1974]; People v Marsh, 20 NY2d 98 [1967]).
IV
We turn now to the dissent. Our dissenting colleagues correctly recognize that any exercise of police power under the Fourth Amendment of the United States Constitution and our State constitutional corollary must be reasonable — a seizure by the police may not be arbitrary. The dissent, however, treats arbitrariness in the context of a traffic stop as an added inquiry separate and distinct from probable cause. There is no valid basis for us to bifurcate these concepts.
Probable cause to believe that an individual has violated a law, or regulation having the force of law, has been equated with the sum of the requirements of the State and Federal Constitutions in this area. Only in the absence of established probable cause have the United States Supreme Court and this Court examined the arbitrariness of police conduct so as to require that police activities be governed by objective standards that restrict officers in looking for incriminating evidence (see, e,g., Florida v Wells, 495 US 1 [1990]; People v Galak, 80 NY2d 715 [1993]). A police officer who can articulate *354 credible facts establishing reasonable cause to believe that someone has violated a law has established a reasonable basis to effectuate a stop. This is in contrast to an inventory search where arbitrariness is necessarily part of the reasonableness equation. In inventory cases, an officer who has impounded a vehicle following a valid arrest can inventory the contents only pursuant to established guidelines to identify and protect the owner’s property. The officer cannot on mere whim look for incriminating evidence. When dealing with inventory searches— because probable cause for an evidence search is lacking — the courts undertake a separate analysis as to arbitrariness. Thus, although the seizure of the vehicle is justified, the subsequent inventory search, lacking in probable cause, cannot be arbitrary and must be performed according to uniform procedures.[5]
Delaware v Prouse (440 US 648 [1979]) supports this rationale and emphasizes the distinction between police actions based on the presence or absence of probable cause. There, the United States Supreme Court invalidated random police stops conducted for vehicle license and registration checks. This type of police intrusion obviously had no probable cause justification. As our dissenting colleagues correctly point out, the Supreme Court was concerned that “ ‘[t]his kind of standardless and unconstrained discretion is the evil the Court has discerned when in previous cases it has insisted that the discretion of the official in the field be circumscribed’ ” (dissenting opn at 362 [quoting Delaware v Prouse, supra, at 661]). The dissent seems to ignore, however, that the Supreme Court also recognized that in contrast to random, suspicionless searches, the decision to stop a vehicle is reasonable where the police have probable cause to believe that a traffic infraction has occurred (id., at 659). The Prouse Court expressly distinguished a random stop from one based on circumstances where, as here, probable cause exists “to believe that a driver is violating any one of the multitude of applicable traffic and equipment regulations” (id., at 661; see also, United States v Brignoni-Ponce, 422 US 873, 882-884 [1975] [disallowing roving patrol stops]).
The other cases relied upon by the dissent are equally inapposite. Each expresses constitutional disapproval of *355 arbitrary conduct in the context of administrative or inventory searches, where probable cause is not in play (see, e.g., Florida v Wells, supra, 495 US, at 4; New York v Burger, 482 US 691, 716-717 n 27 [1987]; Colorado v Bertine, 479 US 367, 372 [1987]; see also, People v Galak, supra). A unanimous Supreme Court in Whren noted that “only an undiscerning reader would regard these cases as endorsing the principle that ulterior motives can invalidate police conduct that is justifiable on the basis of probable cause to believe that a violation of law has occurred” (supra, 517 US, at 811).
The dissenters concede that with “respect to warrantless arrests for violations of the State’s criminal laws (rather than its traffic code), an individualized determination of probable cause will generally provide an objective evidentiary floor circumscribing police conduct” and thereby prevent the arbitrary exercise of search and seizure power (dissenting opn at 363). However, in the context of traffic code violations, the dissent claims that “the existence of probable cause that- the infraction was committed is manifestly insufficient to protect against arbitrary police conduct” (id.). The dissenters assert that because motor vehicle travel is so much a part of our lives and is minutely regulated, total compliance with the law is impossible. We see no basis for this differentiation. While New Yorkers may ubiquitously disobey parts of the Vehicle and Traffic Law, that does not render its commands unenforceable. As noted by the unanimous United States Supreme Court, “we are aware of no principle that would allow us to decide at what point a code of law becomes so expansive and so commonly violated that infraction itself can no longer be the ordinary measure of the lawfulness of enforcement” (Whren, supra, 517 US, at 818).
Because the Vehicle and Traffic Law provides an objective grid upon which to measure probable cause, a stop based on that standard is not arbitrary in the context of constitutional search and seizure jurisprudence. Contrary to the dissent’s view, probable cause stops are not based on the discretion of police officers. They are based on violations of law. An officer may choose to stop someone for a “minor” violation after considering a number of factors, including traffic and weather conditions, but the officer’s authority to stop a vehicle is circumscribed by the requirement of a violation of a duly enacted law. In other words, it is the violation of a statute that both triggers the officer’s authority to make the stop and limits the officer’s discretion. We agree with Whren that the test used *356 by the dissenters would unduly restrict police from enforcing laws that the Legislature has seen fit to impose on individuals for the privilege of driving in this State (see, Vehicle and Traffic Law § 1101 [“It is unlawful and * * * it is a traffic infraction for any person to do any act forbidden or fail to perform any act required in this title”]).
The dissent also raises the spectre of “repeatedly documented” racial profiling in the search and seizure context. There is no claim in any of the three cases before us that the police officers engaged in racial profiling. But, if racial profiling is the analytical pivot of our colleagues’ dissent, their remedy misses the mark. The dissenters’ “reasonable police officer” standard does little to combat or reduce the likelihood of racially motivated traffic stops, since, in their view, an officer’s primary motivation is irrelevant (see, dissenting opn at 368-369).
We conclude, for a number of reasons, that the “reasonable police officer” test should not be followed. The dissenters maintain that under the “reasonable police officer” test, prosecution of a traffic violation would be appropriate even if the stop were pretextual and the other evidence suppressed. They assert a “dearth” of cases in which pretextual stops reviewed in court decisions nationwide involved dismissal of the underlying traffic violations supporting the stops (see, dissenting opn at 374).[6]
The dissenters contend, however, that a stop of a vehicle is arbitrary (i.e., unlawful) if a “reasonable police officer” with traffic enforcement responsibilities would not have made the stop (see, dissenting opn, at 371-372). We do not see how, in the context before us, a court may separate the fruits of a stop (often a gun or drugs) from the supposed illegality of the stop itself. It would seem that if the stop is arbitrary and, therefore, unlawful, it must be so for all purposes. In the name of protecting the rights of New Yorkers, the dissenters’ result would be *357 all too ironic: A police officer could “arbitrarily’ stop someone for speeding and the stop would be valid, but a gun seen in plain view in the car during the stop would be suppressed as unlawfully seized.
Finally, we note that no state court employs the “reasonable police officer” test advocated by the dissenters (see, Appendix). Moreover, even before the Supreme Court decided Whren, most Federal Courts of Appeals had adopted its rationale. In so doing, many had expressly considered and rejected the “reasonable police officer” standard. Notably, in United States v Scopo, the Second Circuit held that “the fact that an officer may be engaged in an arrest which would not usually be effected in the course of the officer’s normal duties does not negate the validity of the arrest” (19 F3d 777, 783 [1994]).[7] Most instructively, the Tenth Circuit — one of the few circuits that fully adopted the “reasonable police officer” standard — had overruled itself and adopted the Whren rationale even before the Supreme Court decided Whren (see, United States v Botero-Ospina, 71 F3d 783, 786-787 [1995]). After applying the “reasonable police officer” standard for seven years, the court found it “unworkable” because its application produced “inconsistent and sporadic” results (id., at 786). In light of the Tenth Circuit’s documented experience, we are further convinced that this standard will lead to equally unsatisfying results in New York.
The invention of the automobile has changed the fabric of American life. While the vast majority of New Yorkers own or drive vehicles, the frequency of their time on the road cannot recast the functional parameters of the Fourth Amendment or article I, § 12. We agree with Whren that the reasonable officer standard would result in inappropriate selective enforcement *358 of traffic laws. How is a court to know which laws to enforce? This test has been rejected by all nine members of the United States Supreme Court and is not utilized by any state in the union. We are simply not free to pick and choose which laws deserve our adherence. If a statute improperly impairs our constitutional liberties, whatever the source, there is a remedy.
We are not confounded by the proposition that police officers must exercise their discretion on a daily basis. Nor are we surprised at the assertion that many New Yorkers often violate some provision of the Vehicle and Traffic Law. But we cannot equate the combination of police officer discretion and numerous traffic violations as arbitrary police conduct that the Supreme Court in Delaware v Prouse viewed as evil. That conduct violates the Fourth Amendment because it was “standardless and unconstrained” (id., at 661). In the cases before us, however, we confirm a standard that constrains police conduct — probable cause under the Vehicle and Traffic Law and its related regulations that govern the safe use of our highways.
Accordingly, in People v Robinson and People v Glenn, the orders of the Appellate Division should be affirmed. In People v Reynolds, the order of the Monroe County Court should be reversed, defendant’s motion to suppress denied, the accusatory instruments reinstated and the case remitted to Rochester City Court for further proceedings in accordance with this opinion.
Appendix
State Courts Approving Whren or Approving Identical Police Conduct
FOLLOWS WHREN
Holland v State (696 So 2d 757, 760 [Fla 1997] [accepting Whren as authoritative interpretation of Florida Constitution’s corollary to Fourth Amendment]); State v Karg (2001 Del Super LEXIS 186, 2001 WL 660014 [Del Super Ct, May 31, 2001] [explicitly holding Delaware Constitution requires Whren objective test]); City of Fargo v Sivertson (571 NW2d 137, 141 [ND 1997]); State v Bolduc (722 A2d 44, 45 [Me 1998] [explicitly approving Whren’s rejection of reasonable officer test]); Commonwealth v Murdough (428 Mass 760, 762-763, 704 NE2d 1184, 1186 [1999] [adopting Whren objective standard under Massachusetts Constitution]); Gama v State (112 Nev 833, *359 836-837, 920 P2d 1010,1012-1013 [1996] [citing Whren as basis to overrule prior cases (see, e.g., Alejandre v State, 111 Nev 1235, 903 P2d 794 [1995]) that had adopted a motivation-based standard under Nevada Constitution]); State v McBreairty (142 NH 12, 15, 697 A2d 495, 497 [1997] [adopting Whren objective test under New Hampshire Constitution]); State v McClendon (350 NC 630, 635-636, 517 SE2d 128, 132 [1999] [adopting Whren objective standard under North Carolina Constitution]); State ex rel. Dept. of Pub. Safety v 1985 Chevrolet Blazer (994 P2d 1183, 1186 [Okla Ct Civ App 1999]); State v Bjerke (697 A2d 1069, 1073 [RI 1997] [declining to depart under Rhode Island Constitution from Whren objective standard]); State v Farabee (302 Mont 29, 37-38, 22 P3d 175, 181 [2000] [adopting Whren objective standard under Montana Constitution]); State v Bartholomew (258 Neb 174, 179, 602 NW2d 510, 514 [1999] [adopting Whren objective standard under Nebraska Constitution]); State v Dickey (152 NJ 468, 479-480, 706 A2d 180, 186 [1998]); State v Nelson (336 SC 186, 194-195, 519 SE2d 786, 790 [1999]); Walter v State (28 SW3d 538 [Tex Ct Crim App 2000]); Muscatell v Cline (196 W Va 588, 597, 474 SE2d 518, 527 [1996] [adopting Whren objective standard under West Virginia Constitution]).
CITES WHREN WITH APPROVAL
State v Ossana (199 Ariz 459, 461, 18 P3d 1258, 1260 [2001]); People v Valenzuela (74 Cal App 4th 1202, 1207, 88 Cal Rptr 2d 707, 711 [Ct App 1999]); People v Ingram (984 P2d 597, 603 [Colo 1999] [en banc]); Karamychev v District of Columbia (772 A2d 806, 813 n 9 [DC 2001]); People v Rucker (294 Ill App 3d 218, 224, 689 NE2d 1203, 1208 [1998]); State v Predka (555 NW2d 202, 205-206 [Iowa 1996]); State v Hardyway (264 Kan 451, 456, 958 P2d 618, 622 [1998]); Wilson v Commonwealth (37 SW3d 745, 749 [Ky 2001]); State v Waters (780 So 2d 1053, 1056 [La 2001]); Wilkes v State (364 Md 554, 572, 774 A2d 420, 430-431 [2001]); People v Kazmierczak (461 Mich 411, 419 n 8, 605 NW2d 667, 672 n 8 [2000]); State v Battleson (567 NW2d 69, 71 [Minn Ct App 1997]); Guerrero v State (746 So 2d 940, 943 [Miss Ct App 1999]); State v Lane (937 SW2d 721, 723 [Mo 1997]); State v Martinez (123 NM 405, 409, 940 P2d 1200, 1204 [1997]); Commonwealth v Hoak (700 A2d 1263, 1268 [Pa Super Ct 1997], affd by an evenly divided court 557 Pa. 496, 734 A2d 1275 [1999]); State v Trudeau (165 Vt 355, 359 n 3, 683 A2d 725, 728 n 3 [1996]); State v Rutzinski (241 Wis 729, 736, 623 NW2d 516, 520 [2001] [adopting Whren objective standard under Wisconsin Constitution]).
*360 HAS WHREN ANALYSIS WITHOUT CITING WHREN
Beauvois v State (837 P2d 1118, 1121 n 1 [Alaska Ct App 1992]); State v Bolosan (78 Haw 86, 94, 890 P2d 673, 681 [1995] [applying under Hawaii Constitution an objective standard later articulated by Whren]); State v Myers (118 Idaho 608, 798 P2d 453, 455 [1990]); Mitchell v State (745 NE2d 775, 787 [Ind 2001] [adopting Whren standard under Indiana Constitution]); City of Dayton v Erickson (76 Ohio St 3d 3, 6, 665 NE2d 1091, 1094 [1996] [adopting objective standard under Ohio Constitution]); State v Carter (287 Ore 479, 485, 600 P2d 873, 875 [1979]); State v Lopez (873 P2d 1127, 1140 [Utah 1994] [declining to depart from Whren’s interpretation of Fourth Amendment in construing parallel provisions of Utah Constitution]); Glasco v Commonwealth (257 Va 433, 448, 513 SE2d 137, 146 [1999]); State v Welch (873 P2d 601 [Wyo 1994]).

. Only Arkansas and Washington have rejected Whren1 s formulation. Both of those states would assess the reasonableness of a traffic stop based on the subjective motivations of the police (see, State v Sullivan, 340 Ark 315, 318, 11 SW3d 526, 528, reh denied 16 SW3d 551 [2000], revd 532 US 769 [2001] [per curiam]; State v Ladson, 138 Wash 2d 343, 358, 979 P2d 833, 842-843 [1999]). In Sullivan, the Arkansas Supreme Court was not interpreting the Arkansas Constitution when it adopted the test of subjective intent. Rather, the Arkansas Supreme Court was interpreting the United States Constitution more broadly than the U.S. Supreme Court had in Whren. The U.S. Supreme Court reversed the Arkansas decision (see, Arkansas v Sullivan, 532 US 769 [2001]).

. Article I, § 12, like the Fourth Amendment,' reads: “The right of the people to be secure in their persons, houses, papers and effects, against unreasonable searches and seizures, shall not be violated, and no warrants shall issue, but upon probable cause, supported by oath or affirmation, and particularly describing the place to be searched, and the persons or things to be seized.”
Article I, § 12 further provides: “The right of the people to be secure against unreasonable interception of telephone and telegraph communications shall not be violated, and ex parte orders or warrants shall issue only upon oath or affirmation that there is reasonable ground to believe that evidence of crime may be thus obtained, and identifying the particular means of communication, and particularly describing the person or persons whose communications are to be intercepted and the purpose thereof.”

. See, e.g., Abraham Abramovsky and Jonathan I. Edelstein, Pretext Stops and Racial Profiling after Whren v. United States: The New York and New Jersey Responses Compared (63 Alb L Rev 725 [2000]); David A. Harris, The Stories, the Statistics, and the Law: Why “Driving While Black” Matters (84 Minn L Rev 265, 296 [1999]); Phyllis W. Beck and Patricia A. Daly, State Constitutional Analysis of Pretext Stops: Racial Profiling And Public Policy Concerns (72 Temp L Rev 597 [1999]).

. Article I, § 11 of the State Constitution reads: “[Equal protection of laws; discrimination in civil rights prohibited.] * * * No person shall be denied the equal protection of the laws of this state or any subdivision thereof. No person shall, because of race, color, creed or religion, be subjected to any discrimination in his civil rights by any other person or by any firm, corporation, or institution, or by the state or any agency or subdivision of the state.”

. Moreover, the dissenters’ reference to the particularity requirement in search warrant cases is inapt. Even in warrantless search cases as, for example, in searches incident to arrest, there is no particularity requirement. In any event, we are not dealing here with search warrants or even with searches but with traffic stops based on particular violations of law established by probable cause.

. Determining the scope of a suppression court’s ruling often cannot easily be gleaned from appellate decisions — reference to the record before the appellate court is often necessary. For example, in People v James (217 AD2d 969 [1995]), the Appellate Division dismissed the entire indictment based upon a pretextual stop/primary motivation analysis (see, id., at 969-970; see also, dissenting opn at 367-368). A review of the Appellate Division record and briefs in James indicates that the indictment charged the defendant with Vehicle and Traffic Law violations that the Appellate Division ultimately characterized as pretextual. It may well be that in many instances, a police officer did not issue a ticket for traffic violations after finding evidence of far more serious criminal activity. That consideration may be relevant to the credibility of the officer in justifying the stop.

. See also, United States v Hassan El (5 F3d 726, 729 [4th Cir 1993] [declining to adopt a test that considers departures from routine police practices]); United States v Trigg (925 F2d 1064, 1065 [7th Cir 1991] [refusing to “consider the conformance of an arrest to usual police practices in determining the reasonableness of an arrest”]); United States v Cummins (920 F2d 498, 501 [8th Cir 1990] [rejecting the “reasonable police officer” standard]).
In addition, other circuits had implicitly rejected the “reasonable police officer” standard (see, United States v Gallo, 927 F2d 815, 818-819 [5th Cir 1991]; cf. also, United States v Ferguson, 8 F3d 385, 391 [6th Cir 1993] [en banc] [applying a “would have” test, but nevertheless concluding that a “stop is reasonable if there was probable cause” and it is “irrelevant whether the stop in question is sufficiently ordinary or routine according to the general practice of the police department or the particular officer making the stop”]). In United States v Harvey, the Sixth Circuit followed Ferguson even though the defendant argued that “no reasonable police officer would have stopped the car * * * absent some other motive” (16 F3d 109, 111 [1994]).