[35 NYS3d 314]

PATROLMEN'S BENEVOLENT ASSOCIATION OF THE CITY OF NEW YORK, INC., et al., Appellants, v CITY OF NEW YORK et al., Respondents.

First Department, June 23, 2016

### APPEARANCES OF COUNSEL

*Dechert LLP*, New York City (*James M. McGuire* and *Paul C. Kingsbery* of counsel), and *Nancy Picknally*, New York City (*Michael T. Murray* of counsel), for Patrolmen's Benevolent Association of the City of New York, Inc., appellant.

*DLA Piper LLP (US)*, New York City (*Anthony P. Coles, Courtney G. Saleski* and *Adam D. Brown* of counsel), for Sergeants Benevolent Association, appellant.

*Zachary W. Carter, Corporation Counsel*, New York City (*Jeremy W. Shweder, Richard Dearing* and *Cecelia Chang* of counsel), for respondents.

### OPINION OF THE COURT

Acosta, J.

The question presented is whether Local Law No. 71 (2013) of City of NY (Local Law 71), which prohibits discriminatory policing in New York City, is preempted by the Criminal Procedure Law. We hold that the CPL does not preempt the local law for two main reasons: first, the two laws occupy different legislative fields (criminal procedure and antidiscrimination); and second, there is no direct conflict between them. We have great respect and appreciation for the important contributions of police officers who enforce our laws and protect us all daily at risk to their own personal safety. However, we also

recognize the City's legitimate interest in protecting New Yorkers from discriminatory law enforcement. As the Court of Appeals has declared, "[d]iscriminatory law enforcement has no place in our law" (*People v Robinson*, 97 NY2d 341, 352 [2001]). Local Law 71 is a step toward making that promise ring true.

## I. Facts and Background

In 2004, defendant Council of the City of New York (the City Council) passed Local Law No. 30 (2004) § 1 (enacting Administrative Code of City of NY § 14-151). The law prohibited New York City-employed law enforcement officers from engaging in "[r]acial or ethnic profiling," which was defined as an act

> "that relies on race, ethnicity, religion or national origin as the determinative factor in initiating law enforcement action against an individual, rather than an individual's behavior or other information or circumstances that link[ ] a person or persons of a particular race, ethnicity, religion or national origin to suspected unlawful activity."

Local Law 30 did not provide for a cause of action against individual officers or for any other enforcement mechanism.

By 2013, the City Council had become concerned that Local Law 30 was ineffective in deterring racial and ethnic profiling by law enforcement, so it amended Administrative Code § 14-151 by enacting Local Law No. 71 (2013). In its Declaration of Legislative Intent and Findings, the City Council emphasized its "concern about the NYPD's growing reliance on stop-and-frisk tactics and the impact of this practice on communities of color." It noted that the number of stops by the New York City Police Department (NYPD) had increased from approximately 97,000 in 2002 to more than 601,000 in 2010, and that "Black and Latino New Yorkers face the brunt of this practice and consistently represent more than 80 percent of people stopped despite representing just over 50 percent of the city's population." The City Council also stated that discriminatory policing "alienates communities from law enforcement, violates New Yorkers' rights and freedoms, and is a danger to public safety," and that Local Law 71 was intended to be "construed broadly, consistent with the Local Civil Rights Restoration Act of 2005."

Local Law 71 ("Bias-based Profiling Prohibited") expanded the list of protected characteristics to include "actual or perceived race, national origin, color, creed, age, alienage or citizenship status, gender, sexual orientation, disability, [and] housing status."

In addition, Local Law 71 added "teeth" to the law by creating a private right of action; an individual subject to bias-based profiling may file an administrative complaint with the New York City Commission on Human Rights or may commence a civil action against individual officers or governmental bodies that employ such officers. A claim of bias-based profiling is "established," inter alia, when a claimant demonstrates that a law enforcement officer has intentionally engaged in bias-based profiling, and the officer fails to prove that the law enforcement action "was justified by . . . factor(s) unrelated to unlawful discrimination" (Administrative Code § 14-151 [c] [1] [ii], as added by Local Law No. 71 [2013] of City of NY). The remedy in any such administrative proceeding or civil action is limited to injunctive and declaratory relief, and the courts may award attorneys' fees and expert fees to prevailing plaintiffs (id. [d] [2], [3]).

Local Law 71 became effective on November 20, 2013. Shortly thereafter, the NYPD issued an internal memorandum (the 2013 Finest Message) characterizing Local Law 71 as "consistent with current department policy and training," which already prohibited reliance on any of the characteristics listed in Local Law 71 as the "determinative factor" in initiating law enforcement action.[1] The instant challenge to Local Law 71 was brought by Patrolmen's Benevolent Association of the City of New York, Inc., an independent union representing more than 22,000 NYPD officers, and Sergeants Benevolent Association, an independent union representing approximately 13,000 active and retired NYPD sergeants. They argue that Local Law 71 is invalid because it is preempted by the CPL.

Supreme Court rejected that argument and adjudged and declared that Local Law 71 is not preempted by the CPL (2014 NY Slip Op 31570[U] [2014]). We now affirm.

## II. Discussion

### A. Standing

Initially, the motion court correctly determined that plaintiffs have standing to bring this action seeking declaratory and injunctive relief. Local Law 71 specifically targets and regulates the conduct of plaintiffs' members, who have been subject to its provisions since it went into effect in 2013. In

---

1. In fact, the "determinative factor" standard appears to have originated in the NYPD's 2002 policy guidelines (NYPD Operations Order No. 11, Department Policy Regarding Racial Profiling, Mar. 13, 2002).

fact, plaintiffs have submitted, on a motion to expand the record, a statement by the Commission on Human Rights that a complaint pursuant to Local Law 71 has been filed against two police officers. Moreover, there is a likelihood that plaintiffs and their members will suffer reputational harm whenever an officer is charged with bias-based profiling under Local Law 71, and they risk the prospect of having to pay attorneys' fees if they are denied defense and indemnification by the City. Plaintiffs have demonstrated an " 'injury in fact—an actual legal stake in the matter being adjudicated' " (*Security Pac. Natl. Bank v Evans*, 31 AD3d 278, 279 [1st Dept 2006], *appeal dismissed* 8 NY3d 837 [2007], quoting *Society of Plastics Indus. v County of Suffolk*, 77 NY2d 761, 772 [1991]).

## B. Preemption

Under New York's constitutional "home rule" provision, municipalities are accorded "broad police powers . . . relating to the welfare of [their] citizens," provided local governments refrain from adopting laws that are inconsistent with the Constitution or state statutes (*Jancyn Mfg. Corp. v County of Suffolk*, 71 NY2d 91, 96 [1987]; NY Const, art IX, § 2 [c]). The Court of Appeals has recognized two ways in which state law may preempt local law: through the doctrine of (1) field preemption, "when a local government legislates in a field for which the State Legislature has assumed full regulatory responsibility," or (2) conflict preemption, "when a local government adopts a law that directly conflicts with a State statute" (*DJL Rest. Corp. v City of New York*, 96 NY2d 91, 95 [2001]).

### 1. Field Preemption

With respect to field preemption, "[t]he State Legislature may expressly articulate its intent to occupy a field . . . [but] [i]t may also do so by implication" (*id.*). Intent to preempt local law may be inferred "from the fact that the Legislature has enacted a comprehensive and detailed regulatory scheme in a particular area" (*id.* [internal quotation marks omitted]). However, the local law will not be preempted under implied field preemption unless the state has "clearly evinced a desire to preempt an entire field thereby precluding any further local regulation" (*Jancyn Mfg. Corp.*, 71 NY2d at 97). Moreover, "[s]tate statutes do not necessarily preempt local laws having only tangential impact on the State's interests. Local laws of general application—which are aimed at legitimate concerns of a local government—will not be preempted if their enforcement only incidentally infringes on a preempted field" (*DJL Rest.*

*Corp.*, 96 NY2d at 97 [citations and internal quotation marks omitted]).

█ Plaintiffs' contention that the CPL expressly and impliedly evinces the state legislature's intent to occupy the field of criminal procedure misses the mark. We do not doubt that the legislature intended that the CPL would exclusively govern criminal procedure throughout the state (including investigative stops by police), but that is of no consequence here, where the local law at issue is not a criminal procedure law but a law concerning civil rights and preventing discrimination on the part of law enforcement. In arguing express field preemption, plaintiffs rely primarily on CPL 1.10 (1), which provides that the CPL applies "exclusively to . . . [a]ll criminal actions and proceedings . . . and . . . [a]ll matters of criminal procedure" in the State of New York, including those that "do not constitute a part of any particular action or case" (subd [a], [b]). They further argue that the legislature impliedly preempted the field of criminal procedure by enacting the CPL as a comprehensive and detailed regulatory scheme. However, the CPL occupies the field of criminal procedure, whereas the local law occupies the field of civil rights and antidiscrimination. In this context, the former is not so broad as to encompass the latter.

The Court of Appeals has noted that "the City possesses broad home rule power and the State concededly has not preempted the area of antidiscrimination" (*New York State Club Assn. v City of New York*, 69 NY2d 211, 219 [1987], *affd* 487 US 1 [1988]), so Local Law 71 is unquestionably valid insofar as it regulates within that field (and does not directly conflict with state law, an issue discussed below). Although the practice commentaries to the CPL make clear that the state statute does not exclude all laws touching on criminal procedure—for example, special proceedings such as habeas corpus, mandamus, and prohibition proceedings, "though they may intimately affect criminal actions, proceedings and procedure, . . . are governed by the CPLR and not the CPL" (Peter Preiser, Practice Commentaries, McKinney's Cons Laws of NY, Book 11A, CPL 1.10)—the CPL generally establishes a comprehensive and uniform system that defines the scope of lawful police action in New York (*see People v Douglass*, 60 NY2d 194, 205 [1983]). Thus, plaintiffs are correct that a local legislature could not pass a law regulating substantive matters of criminal procedure, such as the issuance or execution of an arrest war-

rant, since that obviously would usurp the State's authority in the realm of criminal procedure. However, the field that the State occupies in this regard is not so broad that localities cannot write ordinances that address police investigative conduct without encroaching on the area governed by the CPL.

To the extent the local law touches upon criminal procedure, it does so only tangentially (*see DJL Rest. Corp.*, 96 NY2d at 97). Local Law 71 is a law of general application that furthers the City's legitimate interest in protecting its citizens from discrimination by police officers, and it abuts criminal procedure only insofar as it prohibits police officers from engaging in bias-based profiling (*see id.*; *Matter of Lansdown Entertainment Corp. v New York City Dept. of Consumer Affairs*, 74 NY2d 761, 763 [1989] [laws of general application "are principally aimed at legitimate concerns of local government and do not directly affect the field preempted by the State law"]).[2]

Notably, although the CPL is comprehensive with respect to criminal procedure in general, it is not so comprehensive and detailed with respect to discriminatory policing (*see Lansdown Entertainment Corp.*, 74 NY2d at 762-763). Indeed, no provision in the statute directly addresses how police officers who commit acts of discrimination in their official investigative duties can or should be dealt with, and by which political entities. That certain provisions of the CPL relate to police officers' authority to stop individuals (namely, CPL 140.10, 140.50, and the 2010 amendment to the latter provision [CPL 140.50 (4)]) does not indicate the legislature's intent to preempt any local laws concerning police officers' investigatory conduct. CPL article 140 codified constitutional principles with respect to police stops and searches; its failure to address discrimination by police shows that it is not such a comprehensive and detailed regulatory scheme as to preclude local legislation concerning such conduct. In addition, the 2010 amendment to CPL 140.50, which prohibits police officers in New York City from recording personal identifying information of individuals who are stopped and released by the police (but permits the recording of generic nonidentifying information such as race and gender) (CPL 140.50 [4]), does not evince the legislature's intent to preempt

2. Plaintiffs mistakenly argue that Local Law 71 is not a law of "general application"; the law applies generally to all law enforcement officers operating in New York City (*see People v De Jesus*, 54 NY2d 465, 471 [1981] [law requiring smoke alarms in all business premises is an example of a law of general application]).

local laws such as the one at issue here. Indeed, the legislative history of the amendment indicates that its purpose was to "protect the privacy and due-process rights of innocent New Yorkers" who would otherwise be subject to permanent police surveillance, and that it had nothing to do with upholding New Yorkers' equal protection rights or preventing discriminatory policing (Sponsor's Mem, Bill Jacket, L 2010, ch 176 at 5). This fact provides additional support for our conclusion that the City may legislate in an area that incidentally touches upon criminal procedure, so that its citizens may obtain redress for violations of their civil rights by police.

That the two laws emanate from different legal sources, serve different objectives, and provide for different remedies further underscores their occupation of distinct legislative fields. The CPL codifies and expands upon constitutional provisions governing criminal procedure—for example, the Fourth Amendment's "search and seizure" clause and its New York counterpart (NY Const, art I, § 12). Its objective in large part is to uphold the rights of criminal defendants, and where those rights are violated, it provides remedies in the form of suppressing evidence or dismissing criminal prosecutions (see CPL 170.40 [1] [e]; 710.10-710.70). Conversely, antidiscrimination laws like Local Law 71 give effect to the right to "equal protection of the laws" found in the Fourteenth Amendment and its New York counterpart (NY Const, art I, § 11); Local Law 71 does so by creating a private right of action with distinct remedies in the form of declaratory and injunctive relief.[3]

In short, the CPL and Local Law 71 involve "independent realm[s] of governance" (*DJL Rest. Corp.*, 96 NY2d at 97). The CPL, a state criminal procedure statute, does not evince the legislature's "unmistakable desire" to preclude localities from addressing the discriminatory conduct of law enforcement officers and providing civil remedies to persons subjected to such conduct (see *People v New York Trap Rock Corp.*, 57 NY2d 371, 378 [1982]). Therefore, Local Law 71 is not invalid under the doctrine of field preemption.

### 2. Conflict Preemption

Conflict preemption occurs "where local laws prohibit what would be permissible under State law, or impose prerequisite

---

**3.** The Court of Appeals has already recognized a private right of action, including a remedy for damages, against the State to redress equal protection violations (see *Brown v State of New York*, 89 NY2d 172, 188 [1996]).

additional restrictions on rights under State law, so as to inhibit the operation of the State's general laws" (*Zakrzewska v New School*, 14 NY3d 469, 480 [2010] [internal quotation marks omitted]). A local law will be struck down when, "in direct opposition to [a] pre-emptive scheme, [it] would render illegal what is specifically allowed by State law" (*Lansdown Entertainment Corp.*, 74 NY2d at 763 [internal quotation marks omitted]), or "when a 'right or benefit is expressly given . . . by . . . State law which has then been curtailed or taken away by the local law' " (*Matter of Chwick v Mulvey*, 81 AD3d 161, 167-168 [2d Dept 2010], quoting *Jancyn Mfg. Corp.*, 71 NY2d at 97). However, no conflict exists where a local law prohibits something that might generally be considered permissible by virtue of state law's silence on an issue; it applies only where "the State *specifically permits* the conduct prohibited at the local level" (*New York State Club Assn.*, 69 NY2d at 222 [emphasis added]; *see also Lansdown Entertainment Corp.*, 74 NY2d at 763; *People v Cook*, 34 NY2d 100, 109 [1974] [statement of law that "a locality may not enact a local law which prohibits conduct which is permitted by State law . . . is much too broad. . . . Any time that the State law is silent on a subject, the likelihood is that a local law regulating that subject will prohibit something permitted elsewhere in the State. That is the essence of home rule" (internal quotation marks omitted)]).

█ Applying these principles, we reject plaintiffs' argument that Local Law 71 conflicts with the CPL. Local Law 71 essentially prohibits discrimination by law enforcement, which it terms "bias-based profiling," defined as a law enforcement act "that relies on [an individual's protected status] as the determinative factor in initiating law enforcement action against an individual, rather than an individual's behavior or other information or circumstances that link[ ] a person or persons to suspected unlawful activity." Nowhere in the CPL is there language specifically permitting police officers to engage in such discriminatory conduct. Nor does the case law interpreting the CPL permit police officers to discriminate in this way.

The statute provides in pertinent part that a police officer may stop an individual when the officer "reasonably suspects" that the person is committing, has committed, or is about to commit a crime (CPL 140.50 [1]), and may arrest an individual based on "reasonable cause to believe" that the person has committed a crime or offense (CPL 140.10 [1] [b]). These provi-

sions are essentially a codification of the constitutional "search and seizure" standards for so-called *"Terry* stops" (*see Terry v Ohio,* 392 US 1 [1968]); they were further developed by the Court of Appeals in *People v De Bour* (40 NY2d 210, 223 [1976]).[4] It is undisputed that under the relevant case law, race may not be used by police as the sole factor in initiating a stop, and that such reliance on race would violate both the CPL and Local Law 71. The dispute focuses on whether the CPL permits police officers to use protected status as "the determinative factor" in initiating a stop. We hold that it does not.

Plaintiffs make much of the motion court's analysis equating the terms "sole factor" and "determinative factor." To be sure, the terms are not synonymous.[5] Yet this does not create a direct conflict between the local law and the CPL, because the CPL does not clearly permit a stop in which the officer relies on race as "the determinative factor." The statute itself does not employ either term; nor does it address whether race or other protected status may play any role in a police officer's decision to take action against an individual. Rather, plaintiffs rely on case law interpreting the "reasonable suspicion" and "reasonable cause" standards referenced in the CPL.

However, plaintiffs fail to point to any case in which a court has found reasonable suspicion where race was *the* determinative factor in initiating a law enforcement action. Nor could they, because courts evaluating reasonable suspicion do not look to an officer's subjective intent, but assess the reasonableness of the officer's conduct based on the totality of the

---

4.  In *De Bour,* the Court of Appeals established a four-level approach to determining the legality of street-level police intrusions (40 NY2d at 223). This appeal primarily implicates level-three stops: "where a police officer entertains a reasonable suspicion that a particular person has committed, is committing or is about to commit a felony or misdemeanor, the CPL authorizes a forcible stop and detention of that person" (40 NY2d at 223, citing CPL 140.50 [1]; *Terry v Ohio,* 392 US 1 [1968]).

Plaintiffs argue that a police stop would be lawful under *De Bour* and the CPL even where the officer relied on a protected characteristic (such as race or gender) as "the determinative factor," but that such a stop would be prohibited by Local Law 71.

5.  As plaintiffs correctly note, "sole" means "functioning independently and without assistance or interference" (Merriam-Webster's Collegiate Dictionary 1187 [11th ed 2003]), whereas "determinative" means "having power or tendency to determine; tending to fix, settle, or define something" (*id.* at 340).

The term "determinative factor" implies that it is one factor among others. In other words, the "sole factor" for a police stop will necessarily be the "determinative factor," but the converse is not necessarily true.

circumstances (*see United States v Cortez*, 449 US 411, 417 [1981]; *People v Robinson*, 97 NY2d 341, 350 [2001]; *People v Stephens*, 47 AD3d 586 [1st Dept 2008], *lv denied* 10 NY3d 940 [2008]). Plaintiffs argue that "while one characteristic such as race may not form the sole basis for stopping an individual, one feature among others may ultimately be the distinctive or determinative component matching an individual with a suspect description." This statement may be correct, but plaintiffs can only cite cases in which race was one factor *among others* and in which it is impossible to identify which factor was "the determinative factor" in stopping, searching, or arresting a suspect (*see e.g. People v Johnson*, 102 AD2d 616, 622 [4th Dept 1984] [stating that race is "an identifying factor which . . . assists the police in narrowing the scope of their identification procedure" but "cannot serve as the sole basis for suspicion" (internal quotation marks omitted)], *lv denied* 63 NY2d 776 [1984]; *United States v Brockington*, 378 Fed Appx 90, 92 [2d Cir 2010] ["Although the suspect's physical description was general—a black man wearing a red shirt—the totality of the circumstances included additional information (including the precise location and store into which he entered) giving rise to reasonable suspicion"]; *United States v Salazar*, 945 F2d 47, 48 [2d Cir 1991] [finding reasonable suspicion based on description of defendant as "a short, dark Hispanic male . . . (who) would come and go from (a particularly identified) apartment"], *cert denied* 504 US 923 [1992]).

In each case, race (or some other immutable characteristic) was undoubtedly *a* determinative factor in the law enforcement action, but it is impossible to identify which of several factors was *the* determinative one. Indeed, it is not even clear that there was one determinative factor that outweighed all the others. Two or more factors may be equally determinative. For example, plaintiffs rely heavily on *Johnson* (102 AD2d 616), in which the Fourth Department held that a stop was supported by reasonable suspicion where a police sergeant relied on the defendant's race *in addition to other factors*, such as the type of vehicle the defendant was driving and the vicinity in which he was located. In that case, the sergeant had learned that the suspect in a robbery was described as "a black male in a large, dark colored vehicle [who] was seen in the vicinity" of the robbery location (*id.* at 617). The next day, the sergeant received a call regarding another robbery at a particular location, and the suspect was described only as a

"Black male" (*id.*). The sergeant strategically positioned himself "along one of the [suspect's] likely escape routes," and stopped a large vehicle being driven by a black male (*id.* at 623-624). The Fourth Department upheld the stop as supported by reasonable suspicion.

Plaintiffs presume that the defendant's race in *Johnson* must have been the determinative factor in making the stop (i.e., the one factor that tended to settle the sergeant's decision to stop the defendant), but that presumption is unfounded. As the Court noted, "Race assumes importance in determining the existence of reasonable suspicion only when it is considered *in conjunction with* other facts which provide an articulable basis for suspicion" (*id.* at 622 [emphasis added]). In other words, although race was a factor in the sergeant's decision to stop the defendant, the defendant's vehicle and location were also factors on which the sergeant relied. As far as we can tell, all of the factors were determinative: the defendant was stopped not only because of his race, but also because of his gender, the size of the vehicle he was driving, and his location. Surely, the stop could not have been supported by reasonable suspicion if the defendant had been a black male riding a motorcycle, just as the officer could not have reasonably stopped a white male in a large vehicle.

Similarly, in *Brockington* (378 Fed Appx at 92), the police would not have had reasonable suspicion to stop the defendant if he had been a black man wearing a blue shirt in a different location; nor would the police in *Salazar* (*see* 945 F2d at 48) have had reasonable suspicion to stop the defendant if he had entered a different apartment or was a *tall* Hispanic man. Based on these cases, it is just as inaccurate to say that a defendant's vehicle, location, height, or clothing was "the determinative factor" in making the arrest as it is to say that his race was "the determinative factor."

Because these cases employed a totality-of-the-circumstances test to determine whether a stop, arrest, or search was lawful for Fourth Amendment purposes, the courts did not engage in any analysis to decide which factor among several was *the* determinative one. To engage in that analysis now would be purely speculative. As plaintiffs cannot demonstrate that the CPL or related case law specifically permits police conduct prohibited by Local Law 71, we conclude that there is no direct

conflict with state law that preempts the local law (see *DJL Rest. Corp.*, 96 NY2d at 95).[6]

Furthermore, we reject plaintiffs' argument that the local law conflicts with the CPL because the local law prescribes a subjective standard and the CPL prescribes an objective standard for evaluating police conduct. This argument conflates constitutional search-and-seizure standards (embodied in the CPL) with equal protection standards (embodied in Local Law 71), and suggests a conflict where none exists by comparing these distinct but compatible bodies of law. To be sure, police conduct that may be lawful for search and seizure purposes may nonetheless violate equal protection principles. These different outcomes result naturally from the distinct standards applicable to claims under the Fourth and Fourteenth Amendments (and their state counterparts). As previously stated, the CPL concerns defendants' rights under the search and seizure clauses of the US and New York Constitutions; under this standard, courts do not consider an officer's subjective intent, so a police stop that is motivated by discrimination or pretext may still be upheld if it is otherwise supported by reasonable suspicion (see *People v Robinson*, 97 NY2d 341 [2001]). Conversely, Local Law 71, an antidiscrimination law, concerns individuals' equal protection rights, in which a subjective analysis of an officers' intentions is entirely relevant.

In *People v Robinson*, the Court of Appeals held that "a police officer who has probable cause to believe a driver has committed a traffic infraction" does not violate the search and seizure clause of the State Constitution, even where the officer's "primary motivation is to conduct another investigation" (97

---

6. With respect to preemption where a local law would "impose prerequisite additional restrictions on rights under State law" (*Zakrzewska*, 14 NY3d at 480), we question whether a police officer's authority to conduct a stop and frisk falls under the categories of "rights" or "benefits" to which this branch of the conflict preemption doctrine is ordinarily applied (see *id.*; *Jancyn Mfg. Corp.*, 71 NY2d at 97).

Plaintiffs argue that Local Law 71 conflicts with the CPL because it restricts officers' authority to conduct stops and searches. Defendants contend that the CPL does not confer upon police officers an individual "right" to stop, frisk, and arrest individuals, but rather protects the rights of *civilians* against stops, searches, and arrests that are unlawful.

We agree with defendants. The CPL articulates the federal and state constitutional standards under which police officers may lawfully conduct warrantless stops, frisks, and arrests; it does not confer upon officers a specific "right" to do so.

NY2d at 346). Yet, even as it declined to adopt the "primary motivation" test for search-and-seizure purposes, the Court noted that the "real concern of those opposing pretextual stops is that police officers will use their authority to stop persons on a selective and arbitrary basis" (*id.* at 351). The Court stated that *Whren v United States* (517 US 806 [1996]), which the *Robinson* Court adopted, "recognized that the answer to such action is the Equal Protection Clause of the Constitution" (97 NY2d at 351). Although an officer's subjective intent does not enter into an analysis of the reasonableness of a search or seizure, discriminatory intent can be considered under equal protection standards (*Whren*, 517 US at 813 ["(T)he Constitution prohibits selective enforcement of the law based on considerations such as race. But the constitutional basis for objecting to intentionally discriminatory application of laws is the Equal Protection Clause, not the Fourth Amendment. Subjective intentions play no role in ordinary, probable-cause Fourth Amendment analysis"]). The *Robinson* Court also acknowledged studies showing "that certain racial and ethnic groups are disproportionately stopped by police officers," and called for "both vigilance and concern about the protections given by the New York State Constitution. Discriminatory law enforcement has no place in our law" (97 NY2d at 352). Local Law 71 demonstrates the City's vigilance in preventing discriminatory law enforcement, and sensibly requires a subjective evaluation of police conduct to determine whether the officer was motivated by an intent to discriminate.

Finally, we disagree with plaintiffs' argument that Local Law 71's burden-shifting provision presents a conflict with the CPL. Plaintiffs contend that the local law's burden-shifting regime "contradicts the governing procedural rules set forth in the CPL for determining the lawfulness of law enforcement action by police officers." Again, plaintiffs overlook the fact that the CPL is concerned with evaluating the lawfulness of police conduct vis-à-vis search and seizure principles; the local law, on the other hand, evaluates police conduct to determine whether a civil remedy applies as a consequence for discrimination. Thus, any inconsistency with respect to the CPL in this regard does not constitute a direct conflict or "inhibit the operation of the State's general laws" (*Zakrzewska*, 14 NY3d at 480 [internal quotation marks omitted]). In fact, the burden-shifting provision employed by Local Law 71 is consistent with burden shifting in other antidiscrimination laws (*see e.g. Ben-*

*nett v Health Mgt. Sys., Inc.*, 92 AD3d 29, 34 [1st Dept 2011], *lv denied* 18 NY3d 811 [2012]), and is similar to the burden shifting in equal protection analysis (*see United States v City of Yonkers*, 96 F3d 600, 612 [2d Cir 1996]).

## III. Conclusion

Accordingly, the order and judgment (one paper), of the Supreme Court, New York County (Anil C. Singh, J.), entered June 19, 2014, insofar as appealed from as limited by the briefs, adjudging and declaring that Local Law 71 is not preempted by the Criminal Procedure Law, should be affirmed, without costs.

MAZZARELLI, J.P., MOSKOWITZ and GISCHE, JJ., concur.

Order and judgment (one paper), Supreme Court, New York County, entered June 19, 2014, affirmed, without costs.

---

Motions to expand the record granted.